[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13763

_____

SARA WATTS,

Plaintiff-Appellant,

*versus*

JOGGERS RUN PROPERTY OWNERS ASSOCIATION, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cv-80121-AMC

_____

Before JORDAN, BRASHER, and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

In this appeal, we are presented with the question of whether Sara Watts, an African American woman who sued her former homeowners' association, the Joggers Run Property Owners Association (the "Joggers Run HOA" or "HOA"), presented plausible claims under the Fair Housing Act ("FHA") and the Civil Rights Act to overcome the HOA's motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6).[1]  She asserted that the HOA unlawfully interfered with her right to the full enjoyment of her property through unwarranted citations for violations she contested, through restricted access to community amenities, and through the treatment she received as a former HOA board member.  Watts' claims rested on provisions from the FHA (42 U.S.C.

---

[1] We recognize that Joggers Run is named as a "Property Owners Association" ("POA") and that Florida law distinguishes between a "homeowners' association," governed by Chapter 720 of the Florida Statutes, and a "property owners' association," which falls under Chapter 712.  *Compare* Fla. Stat. § 720.301(9) (defining an HOA as "a Florida corporation responsible for the operation of a community or mobile home subdivision . . . in which membership is a mandatory condition of parcel ownership"), *with* Fla Stat. § 712.01(5) (defining a property owners' association as "a homeowners' association as defined in [Section] 702.301, a corporation[,] or other entity responsible for the operation of property . . . in which membership is a mandatory condition").  Thus, similar to the relationship between a square and a rectangle, an HOA can also be a POA, but a POA need not be an HOA.  Here, both parties seem to concede that Joggers Run is a POA that is also an HOA, but any difference does not change our analysis given both require mandatory membership in a community covenant.

§§ 3604(b), 3617), and the Civil Rights Act (42 U.S.C. §§ 1981, 1982). The district court granted the HOA's motion to dismiss on the grounds that the FHA does not cover any of the discriminatory conduct that Watts alleged had occurred after she purchased her home, and that Watts failed to allege with any specificity the actual terms in her homeowner's contract which the HOA allegedly violated.

After a thorough review of the record and the parties' briefs, and with the benefit of oral argument, we reverse the district court's judgment and remand the case for further proceedings.

## I.    FACTUAL BACKGROUND[2]

In August 2013, Watts purchased a home in the Joggers Run community in West Palm Beach, Florida where she lived for nine years with her two children and, for a while, with a service dog. The HOA governed the Joggers Run community and, as a resident of the community, Watts was subject to the HOA's governing documents—the Joggers Run's Rules and Regulations (the "HOA Rules").[3]

---

[2] These facts come from allegations in Watts' second amended complaint because, in reviewing a motion to dismiss for failure to state a claim, we "accept[] the allegations in the complaint as true and construe[] them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (citation omitted).

[3] Only for this appeal, which comes to us at the motion to dismiss phase, we take judicial notice of Joggers Run's relevant bylaws, covenants, and current rules available on the HOA's website in assessing the plausibility of Watts' allegations. *See* Joggers Run Prop. Owners Ass'n, Inc., Association Documents

4                    Opinion of the Court                22-13763

In 2015, Watts became an HOA board member and was the only African American person who attended board meetings. She claimed that White Board members, including the Board's White president, made negative, disparaging comments about people of color, including her. For example, when referring to people of color, the HOA president would call them "monkeys." In another instance, a White board member said "Bye, Felicia" to Watts, a

(2024), https://www.grsmgt.com/association/joggers_run/association-documents/ [https://perma.cc/YR46-PFVK]; Joggers Run Parking Rules & Regulations, https://www.grsmgt.com/wp-content/uploads/2022/07/e9d93391-ec32-4565-865d-5ce219b57ea9.pdf [https://perma.cc/3T3P-NMFZ]. In reviewing a motion to dismiss, we may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 & Supp. 2007)). Courts may take judicial notice of "relevant public documents required to be filed" that are "not subject to reasonable dispute." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999); *see also United States ex rel. Rosales v. Amedisys N.C., L.L.C.*, 128 F.4th 548, 554 (4th Cir. 2025) (same). Here, Joggers Run must publish the HOA Rules under Florida law. Fla. Stat. § 720.303(4)(b) (requiring homeowners' associations with 100 or more parcels to publish governing documents). Moreover, Watts' second amended complaint repeatedly refers to the HOA Rules, making clear that these Rules are "central to [her] claim." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024) (citations and internal quotations omitted). At oral argument, the HOA argued that Watts' complaint was conclusory for failing to cite chapter-and-verse of the Rules. However, the HOA did not dispute that the HOA Rules exist or that Watts was subject to these Rules. If Watts had misrepresented the HOA Rules, the HOA had the opportunity to attach the Rules to dispute Watts' claims, but it did not. Thus, we find it appropriate to use our "wide discretion" to take judicial notice of facts "at any stage in a proceeding" in this instance. *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204–05 (11th Cir. 2004).

phrase that, according to Watts, is associated with the discriminatory stereotype of an "African American crack addict."[4]  During board meetings, when the floor was open for residents' comments, the Board limited Watts' speaking time—the only African American present—to three minutes.  The Board did not impose a three-minute time restriction on anyone else who wished to speak during the open comment period.  Moreover, on one occasion, police officers removed Watts from a Board meeting, although the complaint does not state for what reason.  On October 18, 2017, after Watts complained about the discriminatory comments and treatment, the Board stripped her of her Board membership without any notice.

When Watts first joined the Board, she proposed Joggers Run re-open the basketball courts, an amenity paid for by HOA fees, but the Board repeatedly denied her proposal and cited problems in the past with trespassers and "too many people of color" using the courts.  The Board eventually reopened the basketball courts but shut them down again after an incident in August 2019 involving a White board member who harassed Watts' son and his friends who were playing on the court and was aggressive in forcing them to leave.  The Board's response after that incident, and

---

[4] The "expression comes from the classic film *Friday* . . . released in 1995" in which "Felicia" is a character who "displays many of the signatures of the stereotypical 'crackhead' in many African American urban comedies." Catherine Knight Steele, *The Digital Barbershop: Blogs and Online Oral Culture Within the African American Community*, Soc. Media + Soc'y 1, 6 (2016), https://journals.sagepub.com/doi/full/10.1177/2056305116683205.

after receiving more complaints about Black kids using the court and noise, was to restrict all access.

Watts also alleged that the HOA selectively enforced the HOA Rules pertaining to parking, pets, yard sales, and penalty fees. For example, per the parking rules, residents were required to leave a handwritten note on any car without a proper HOA decal if the car would remain parked overnight in a non-designated parking spot. Moreover, the rules required the HOA to issue at least two warning notices before towing any vehicles parked in a non-designated spot. In practice, however, a White Board member regularly had cars without the proper decal or an explanatory note parked overnight in non-designated parking places and yet never received a parking citation or had a vehicle towed. Watts' son, on the other hand, who often returned from work late at night when no designated parking spots were available, was not afforded that same treatment. Despite his compliance with the parking policy by leaving a note on the car explaining he was a resident, the HOA had his car towed without any notice, in violation of the HOA's own rules. On another occasion during the COVID pandemic, after Watts informed the HOA that she was having trouble getting an appointment at the DMV to renew her son's expired registration tag, the HOA towed her son's car and then sold it at an auction. When Watts tried to speak with the Board president about the parking issues, the president yelled at her, tried to issue a no-trespass order against her, and issued a citation against her for "being un-neighborly."

Watts also complained about the selective enforcement of the HOA's pet policies. A neighbor called Watts to complain about her service dog running up to the neighbor; however, it was the neighbor's dog that was not in control which caused Watts' dog to leave Watts' porch and approach the neighbor. Nevertheless, because of this "escalated act from a White [n]eighbor," Watts felt forced to give up her service dog. Meanwhile, a different White neighbor was allowed to keep a Pitbull, a breed that the HOA Rules specifically forbade. The HOA also penalized Watts for actions which did not violate HOA policies. For example, there were no notices sent to homeowners stating that "yard sales" were not allowed, and Watts' White neighbor was able to have a yard sale without any HOA problems. Yet, when Watts held a yard sale a month after her neighbor, the HOA sent her a certified letter complaining about the yard sale, claiming it "caused harm to the community." In addition, the HOA separately cited Watts for "things in her yard" without any other explanation even though one of her neighbors, who later became a Board member, often left "dog poop in bags at his back patio and left his trash bin out for about a month" without incident. HOA home repairs also became an area of contention when Watts was charged "mysterious fees" related to roof renovations even though her home was passed over in favor of fixing the roof of a White neighbor, whose roof was repaired by the HOA at no cost and with no adverse HOA action.

Watts alleged that the HOA's discriminatory treatment extended to her guests as well. She pled that one of her African American friends was falsely accused of trespassing and vandalizing cars.

As a result of these accusations, her guest stopped coming to her home, primarily out of fear of being falsely accused of a crime and arrested. In an effort to address the matter, starting in early 2019, Watts filed a police report regarding the harassment she experienced, she had an attorney send a cease-and-desist letter to the Board, and she created a video blog with examples of the ongoing discrimination she faced, all to no avail.

Watts then decided to pursue other legal avenues, and, on December 6, 2021, she filed an administrative complaint of discrimination with the U.S. Department of Housing and Urban Development ("HUD") against the HOA under 42 U.S.C. § 3610(a). On December 16, Watts sued the HOA in state court, and the HOA removed the action to federal court and moved to dismiss it. Watts amended that complaint to include the FHA and Civil Rights Act claims now at issue.

Watts contends that, with all the HOA and residents' harassing treatment, she had no other option but to move out of the Joggers Run community and sell her home. So, on March 30, 2022, she sold it and left Joggers Run. Following the sale, she and her family were homeless, she had to separate her children and temporarily house them with friends, she put her family's personal belongings in storage, and she carried the concern about not finding a new home. She maintained that the discriminatory acts affected her financially, emotionally, and physiologically, which caused her to seek medical treatment.

## II.    PROCEDURAL HISTORY

In her second amended, four count complaint, Watts alleged the HOA's actions were racially motivated and unlawfully interfered with the use and enjoyment of her home, altered the "terms, conditions, or privileges" related to her home, and denied or limited the services to which she was entitled as a homeowner, in violation of Section 3604(b) and Section 3617 of the FHA.  Watts further alleged that the HOA's discriminatory conduct also denied her equal contract rights in violation of Section 1981 of the Civil Rights Act and denied her equal property rights based on her race in violation of Section 1982 of the Civil Rights Act.

The HOA moved to dismiss the entire complaint for failure to raise any cognizable claim under the FHA or the Civil Rights Act, and the district court granted that motion.  Although the court found that "Defendant's alleged conduct of harassing Plaintiff and her family is reprehensible," it ruled that none of her allegations could support any of her four statutory claims.  First, as to her claim under Section 3604(b) of the FHA, the court held that Watts failed to allege discriminatory conduct "connected to the sale or rental of a dwelling."  Accordingly, the court also held she did not sufficiently plead a claim under Section 3617 of the FHA which, the court reasoned, required identifying at least one right under Sections 3603–3606 that the HOA infringed upon.  Next, as to the Section 1981 Civil Rights Act claim, the court found that Watts' complaint did not identify the provisions within the contractual relationship that the HOA actually violated.  Finally, as to the Section 1982 Civil Rights Act claim, the court held that Watts'

complaint did not explain how the HOA's conduct infringed on her rights to inherit, purchase, lease, sell, hold, or convey personal property.

### III.    STANDARD OF REVIEW

"We review the district court's grant of a motion to dismiss for failure to state a claim *de novo*, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hunt*, 814 F.3d at 1221 (citation omitted). "To withstand a motion to dismiss" for failure to state a claim, a "complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Plaintiff must allege "more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Nevertheless, "plausibility is not probability." *Lane v. Philbin*, 835 F.3d 1302, 1305 (11th Cir. 2016).

That said, in FHA discrimination cases, "[b]efore discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case." *Hunt*, 814 F.3d at 1221 (citation omitted). In such instances, "the allegations in the complaint 'should be judged by the statutory elements of an FHA claim.'" *Id.* (quoting *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 250 (9th Cir. 1997)).

## IV.    DISCUSSION

Home ownership has long been viewed as the heart of the American Dream.  Yet almost sixty years ago, "Congress . . . recogniz[ed] the awful reality" that "[m]illions of Americans have been denied fair access to decent housing because of their race or color."[5] At that time, a bipartisan committee that President Lyndon B. Johnson appointed issued a report advising that a "national fair housing law" was "essential" to end "evident" and "profoundly divisive" housing segregation that limited the opportunity of all Americans to equal access to housing and the promise that this country could become a "single nation" rather than "a dual society."[6]  So, in 1968, Congress passed the Fair Housing Act and declared that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."    42 U.S.C. § 3601.    Further, in Section 1981 and Section 1982 of the Civil Rights Act, Congress provided that all Americans, regardless of race, were entitled to equal contract and property rights.  42 U.S.C. §§ 1981, 1982.

Against this backdrop, we have explained "'the language of the FHA is broad and inclusive,' 'prohibits a wide range of conduct,' 'has a broad remedial purpose,' and 'is written in decidedly far-reaching terms.'"  *Ga. State Conf. of the NAACP v. City of La-Grange*, 940 F.3d 627, 631–32 (11th Cir. 2019) (quoting *City of Miami*

---

[5] 114 Cong. Rec. 2279 (1968) (statement of Sen. Edward Brooke).

[6] NAT'L ADVISORY COMM'N ON CIV. DISORDERS, REPORT ON THE CAUSES, EVENTS, & AFTERMATHS OF THE CIVIL DISORDERS OF 1967 225 (1968).

*v. Wells Fargo & Co.*, 923 F.3d 1260, 1278 (11th Cir. 2019)). In addressing each of Watts' arguments on appeal, we conclude that the district court too narrowly construed the FHA, Section 1981, and Section 1982, and that Watts plausibly stated claims for relief for all the alleged statutory violations.

### A.  Section 3604(b) of the Fair Housing Act

Section 3604(b) prohibits race-based discrimination related to the sale or rental of a home, including its attendant facilities and services.  42 U.S.C. § 3604(b).  Watts' allegations, which we accept as true and construe in her favor, indicate that she entered into an agreement with the HOA after purchasing her home regarding the amenities to which she would have access and the rules and regulations by which she and her family would abide.  Watts' complaint is grounded on discriminatory behavior on the HOA's part pertaining to restricted access to the basketball courts and parking areas, inconsistent enforcement of HOA rules and regulations, and unjustified fees and other sanctions against her.

The district court's decision was based on its determination that the HOA actions about which Watts complained were not covered under Section 3604(b) as "terms, conditions, or privileges" related to the sale of her home, or as part of the "provision of services or facilities in connection therewith."[7]

---

[7] As a threshold matter, the HOA concedes that, in *LaGrange*, we held that Section 3604(b) applies to conduct that occurs after the sale or rental of housing, i.e., "post-acquisition conduct." *LaGrange*, 940 F.3d at 632.  Therefore, the mere fact that Watts' complaint is based on HOA actions that occurred after

When interpreting a statute, courts begin by "reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis[.]" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, (2006)). So we begin with the text of Section 3604(b). In full, Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Congress did not provide a list as to what "terms, conditions, or privileges" are included in the "sale . . . of a dwelling" as opposed to those that are outside of a "sale."

"In the absence of a statutory definition of a term, we look to the common usage of words for their meaning." *Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 795 (11th Cir. 2003) (quoting *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001)). Courts often turn to dictionary definitions for guidance on the common use of a word. *Id.* However, "we must be mindful that to ascertain the meaning of a statute, '[w]e do not look at one

---

she moved into the community is not a categorical bar to her claim for relief. The HOA suggests that Section 3604(b) does not apply to previously acquired housing. However, Watts was a homeowner at all relevant times, and as explained below, *LaGrange* recognizes that Section 3604(b) provides a remedy for discriminatory acts that interfered with agreements arising from the sale or rental of a dwelling. *Id.* at 634.

word or term in isolation, but instead we look to the entire statutory context.'" *United Mine Works of Am. Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1143 (11th Cir. 2018) (quoting *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999)). Thus, we must read "terms, conditions, or privileges" in the context of housing, specifically owning or renting property.

"Terms" in a contractual context are "propositions stated or promises made which, when assented to or accepted by another, settle the contract and bind the parties." *Terms*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968). A "condition" is "[a] future and uncertain event upon the happening of which is made to depend the existence of an obligation, or that which subordinates the existence of liability under a contract to a certain future event." *Condition*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968). A "privilege" is "[a] particular and peculiar benefit or advantage enjoyed by a person, company, or class beyond the common advantages of other citizens." *Privilege*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968). Generally, "ownership" of a home means the owner has "the totality of rights, powers, privileges[,] and immunities which constitute complete property." RESTATEMENT (FIRST) OF PROP. § 10 cmt. b (AM. L. INST. 1936).

In *LaGrange* we concluded that city-provided utility services fell within the scope of Section 3604(b). 940 F.3d at 633–34. In *LaGrange*, plaintiffs challenged city policies that required them to pay debts owed to the city and present valid state or federally issued photo identification to access utility services such as electricity, gas,

and water as a violation of Section 3604(b) because the policies disproportionately harmed Black and Hispanic residents. *Id.* at 630–31. We held that "a service within the meaning of [Section] 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling." *Id.* at 634. We focused on two factors in determining that water, gas, and electricity were "directly connected to the sale or rental of a dwelling." *Id.* First, we concluded that the utility services were "clearly, directly connected to the sale or rental of a dwelling" because as part of buying a home, a resident "*must* obtain basic utility services," and we explained that "in the context of housing, a person cannot obtain such services without first obtaining a dwelling." *Id.* (emphasis added). Second, we concluded that the utility services were "essential to the habitability of the dwelling" and that, without these utility services, a resident would be unable to live in the home. *Id.*

Similarly, HOA membership is mandatory for homeowners within Joggers Run. Fla Stat. § 712.01(5). The HOA Rules dictate where a resident or guest may park their car without penalty, the use of shared facilities, and participation in the community's governance. The rights that flow from mandatory HOA membership are "fundamental to the ability to inhabit" the shared property. *LaGrange*, 940 F.3d at 634. The terms, conditions, and privileges of owning a Joggers Run home as provided in the HOA Rules may not be a matter of life and death for residents, but these contractual rights are part-and-parcel of that planned housing community. *Id.*

Furthermore, in evaluating a similar provision of the FHA, we have established that access to communal spaces is within the scope of the "terms, conditions, and privileges" of the sale or rental of a dwelling. *Hunt,* 814 F.3d at 1224–25. The provision at issue in *Hunt*, Section 3604(f)(2), mirrors the language of Section 3604(b) except that it extends the same protections to persons with a disability. *Id.* at 1224 (citing 42 U.S.C. § 3604(f)(2)).[8] Hunt alleged that after she and her son, who has Down syndrome, moved into their home, the landlord yelled at her son, forced him to do maintenance work, barred him from areas open to other residents, and used law enforcement as a means of furthering the discrimination. *Id.* at 1224–25. She argued that the landlord imposed these restrictions and requirements on her son and not others because of his disability. *Id.* We reversed the district court's dismissal of Hunt's claims for failure to state a claim, finding that her allegations of discriminatory conduct were sufficient to state a claim under Section 3604(f)(2). *Id.* at 1225. Similarly, according to Watts' complaint, she and her family were denied access to facilities, were

---

[8] Section 3604(f)(2) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--

> (**A**) that person; or
>
> (**B**) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (**C**) any person associated with that person.

42 U.S.C. § 3604(f)(2).

restricted from engaging in the same behavior as White residents, and were subjected to harassing behavior because of their race.

Our plain reading of the statute is further bolstered by a HUD regulation that implements the FHA, which defines discriminatory actions "relating to the sale or rental of a dwelling" to include "*[l]imiting the use* of privileges, services[,] or facilities *associated* with a dwelling because of race." 24 C.F.R. § 100.65(b)(4) (emphasis added).

Here, the relevant HUD regulation was implemented contemporaneously with the Fair Housing Amendments Act of 1988—a statute enacted to address the enforcement "gap[s]" Congress concluded rendered the original FHA "ineffective." *Sec'y, U.S. Dep't of Housing & Urb. Dev. ex rel. Herron v. Blackwell*, 908 F.2d 864, 868–69 (11th Cir. 1990) (quoting H.R. Rep. No. 711, at 15–16 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2176–77). Thus, this regulation is "especially useful" in our independent determination of what "terms, conditions, and privileges" are related to a sale of a dwelling for purposes of enforcing the FHA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). *See generally Perez v. Owl, Inc.*, 110 F.4th 1296, 1308 (11th Cir. 2024) (finding persuasive the Department of Labor's long-standing and consistent interpretation of the term "regular rate" in independently analyzing the term's meaning under the Fair Labor Standards Act). Furthermore, the Supreme Court has long "recognized that HUD's views about the meaning of the FHA are entitled to 'great weight.'" *Bloch v. Frischholz*, 587 F.3d 771, 781 (7th Cir. 2009) (*en banc*) (summarizing

Supreme Court precedent in recognizing that 24 C.F.R. § 100.65(b)(4) is an important tool in interpreting Section 3604(b)). We, therefore, give weight to 24 C.F.R. § 100.65(b)(4) which clarifies that unlawful post-acquisition conduct includes limitations on a homeowner's access to privileges, services, or facilities associated with their home.  24 C.F.R. § 100.65(b)(4).

Taken together, the text of Section 3604(b), our precedent, and HUD regulations confirm that discrimination against a homeowner by an HOA violates the FHA.  Thus, we must determine whether Watts' allegations regarding the HOA's conduct, if true, that limited *contractual entitlements and obligations* under the HOA Rules fall within the scope of Section 3604(b).

Here, when Watts bought her house, she signed a contract to become a member of the Joggers Run community as a condition of the sale.  The HOA Rules govern the Joggers Run community and establish the *additional* rights and obligations, beyond the traditional rights in the ownership of the home itself, that homeowners accept when purchasing their home.  These additional rights included access to the basketball court, the ability under certain conditions to park in non-designated parking spaces, obtaining roof repairs and similar services, and access to the HOA meetings. These rights fall squarely within the common usage definitions of "privileges, services, and facilities associated with a dwelling." Thus, when a person enters into an enforceable agreement as part of purchasing a property, such as the mandatory HOA contract here, Section 3604(b) prohibits discrimination related to any

additional privileges, services, and facilities afforded by that agreement.  Our interpretation of Section 3604(b)'s scope is consistent with HUD's regulation and with our understanding that the "'language of the FHA is broad and inclusive,' 'prohibits a wide range of conduct,' 'has a broad remedial purpose,' and 'is written in decidedly far-reaching terms'" in "dealing with the specific problems of fair housing opportunities." *LaGrange*, 940 F.3d at 631–33 (citations omitted).

Watts' contention that the HOA's actions were racially motivated are best illustrated in her allegations that the HOA did not want to encourage Black kids to use the basketball courts and that one neighbor actually accosted her son and his friend and used expletives and derogatory language to get them off the court.  She maintained that her Black guest was harassed and accused of trespassing and vandalizing cars in the community, that the president of the HOA referred to non-White individuals as "monkeys," that a derogatory phrase was used against her, that the Board expressed concerns about too many "people of color" using the basketball courts, and that Board members made contemporaneous complaints that there were "too many black kids at the court."

Watts' allegations plausibly fall within the scope of Section 3604(b) because the contractual rights flowing from her HOA membership were "directly connected to the sale" of her home. *LaGrange*, 940 F.3d at 634.  Further, she sufficiently alleged that she was denied equal access and treatment because of her race.

Moreover, this reading of Section 3604(b) as applied to Watts' complaint is consistent with our sister courts. The Seventh Circuit sitting *en banc* in *Bloch v. Frischholz* held that Section 3604(b) encompassed the plaintiff's claims that a condominium association's prohibition against Jewish residents displaying religious symbols violated Section 3604(b). 587 F.3d at 783. The *Bloch* court explained that mandatory association membership is a condition of the sale and held that "[Section] 3604(b) prohibits the [Condominium] Association from discriminating . . . through its enforcement of the rules, even facially neutral rules." *Id.* at 780. The *Bloch* court went on to explain that the "contractual connection" between an association and a condo unit owner distinguished claims against associations from "a blanket 'privilege' to be free from all discrimination" or a "quarrel[] between neighbors." *Id.* (citation omitted). Similarly, the Third Circuit, in *Curto v. A Country Place Condominium Association*, analyzed whether a condominium association's rules that allotted unequal, sex-segregated time at a communal pool violated Section 3604(b). 921 F.3d 405, 407–10 (3d Cir. 2019). The Third Circuit, with guidance from 24 C.F.R. § 100.65(b)(4), ruled the communal pool was a "'facility associated with a dwelling' within the meaning of the statute and regulation." *Curto*, 921 F.3d at 410.

Accordingly, based on Section 3604(b)'s language, HUD's implementing regulation, and the dictionary definitions of relevant terms and, consistent with our broad application of the FHA, the district court's interpretation of Section 3604(b) was erroneous. Because Watts set forth sufficient facts to raise a plausible claim

22-13763                Opinion of the Court                21

under Section 3604(b), we reverse the district court's dismissal of this claim.

### B.  Section 3617 of the Fair Housing Act

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by Section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Thus, to succeed, Watts need only plausibly allege an underlying violation of one of the four statutes, including Section 3604, which the Defendants allegedly violated. Because we disagree with the district court's dismissal of Watts' Section 3604(b) claim, we also conclude that Watts has satisfied her burden for maintaining a claim under Section 3617. *See Sofarelli v. Pinellas County*, 931 F.2d 718, 721–22 (11th Cir. 1991) (finding the plaintiff plausibly stated a Section 3617 claim where individuals interfered with rights guaranteed under Section 3604(b)); *Evans v. Tubbe*, 657 F.2d 661, 662–63 & n.3 (5th Cir. Unit A 1981) (vacating a dismissal where a Black woman who had been intimidated and harassed for using her property alleged a valid claim under Sections 1982, 3604, and 3617 given that the "Fair Housing Act prohibits not only direct discrimination but practices with racially discouraging effects" (citation and internal quotations omitted)).[9]

---

[9] Decisions of the Fifth Circuit prior to September 30, 1981 are "binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

### C.  *Section 1981 of the Civil Rights Act*

Section 1981 of the Civil Rights Act provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a).  This includes the right to enjoy "all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).  A Section 1981 claim requires allegations of "(1) intentional racial discrimination (2) that caused a contractual injury." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1296 (11th Cir. 2021) (citations omitted).  Unlike the FHA, Section 1981 applies to the creation and enforceability of all contracts.  *See generally Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477 (2006) (explaining that Congress added Section 1981(b) to include discrimination at any stage of a contractual relationship, "to bring postformation conduct . . . within the scope of § 1981").  The district court held Watts failed to identify either specific contractual covenants and restrictions or the benefits, privileges, terms, or contractual rights that the HOA allegedly violated.

When considering the sufficiency of Watts' Section 1981 claim, she only needed to "initially identify an impaired 'contractual relationship' . . . under which [she had] rights." *Domino's Pizza*, 546 U.S. at 476.  In a variety of contexts involving claims under Section 1981, courts have recognized that the cornerstone of such a claim is the existence of a contractual relationship.  *See, e.g.*, *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1172 (11th Cir. 2016) (ruling that allegations of a contractual relationship were not

conclusory where defendants did not dispute the existence of the employment contract); *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (deciding a customer's allegations that a restaurant's acceptance of her pizza delivery order sufficiently stated a contractual relationship).  Recently, we found that a hotel guest of Arab descent properly raised a Section 1981 claim even though his complaint focused on the contractual injury as opposed to a particular contractual provision which triggered his contractual rights.  *Ziyadat*, 3 F.4th at 1296 (citations omitted); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341–44 (2020) (Ginsburg, J., concurring in part) (affirming that a plaintiff may plead a contractual injury that occurs at any point during the "entirety of the contracting process[,]" including "[p]ostformation racial harassment").  Similarly, Watts' complaint focused on injuries arising from her contractual relationship with the HOA under the HOA Rules.

Here, the HOA Rules created an enforceable contract that governed Watts' responsibilities as a Joggers Run resident and the benefits of her membership.  Watts alleged the HOA discriminated against her based on her race and, in so doing, the HOA violated its own rules, denied Watts and her children the full benefits of living in the community, and interfered with her privileges as a property owner.  Thus, Watts' complaint plausibly identified a "contractual relationship" which the HOA allegedly violated in contravention of their own policies, rules, and regulations, thus breaching her rights under Section 1981.  *Domino's Pizza*, 546 U.S. at 477.  Therefore, she has plausibly stated a Section 1981 claim.

### D. *Section 1982 of the Civil Rights Act*

Section 1982 of the Civil Rights Act provides "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by [W]hite citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. In contrast to the FHA, Section 1982 protects "broadly defined" property rights. *City of Memphis v. Greene*, 451 U.S. 100, 122 (1981). The district court rejected Watts' Section 1982 claim on the ground that, because she purchased and sold her home "without interference," she could not establish a Section 1982 violation.

The Supreme Court has "broadly construed" Section 1982 "to protect not merely the enforceability of property interests acquired by [B]lack citizens but also their right to . . . *use property* on an equal basis with [W]hite citizens." *Greene*, 451 U.S. at 120 (emphasis added). The Court has held that Section 1982 protections extend to community membership benefits in recreational facilities to include a community resident's family and friends where access has been restricted based on race. *Id.* at 121–22 (collecting Supreme Court cases). For example, in *Tillman v. Wheaton-Haven Recreation Association, Inc.*, an association was created to operate a community swimming pool, and under its bylaws, it provided that membership "shall be open to bona fide residents . . . of the area within a three-quarter mile radius of the pool." 410 U.S. 431, 433 n.3 (1973). However, the association closed off membership, and thus access to the pool, to a Black resident who lived within the three-quarter-mile geographic range delineated in the bylaws. *Id.* at 433–34. The

association also adopted a policy to prevent White members from bringing Black guests to the pool. *Id.* at 434. The Supreme Court held that the association's racially discriminatory actions fell within the scope of Section 1982 because "[w]hen an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area." *Id.* at 437.

Watts alleged that the HOA created a dual property system: White owners could fully enjoy the amenities, common areas, and services that flowed from their property while Watts, as a Black resident, could not. Her allegations that the HOA's discriminatory actions prohibited or limited her access to HOA membership benefits are sufficient to support her Section 1982 claim that the HOA violated her ability to "use property on an equal basis with [W]hite citizens." *Greene*, 451 U.S. at 120; *see also United States v. Brown*, 49 F.3d 1162, 1167 (6th Cir. 1995) (adopting the Second and Fifth Circuit's reasoning that the "'use' of property is a protected civil right" under Section 1982 (citation omitted)); *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) (collecting cases in which Section 1982 was violated when landlords denied, evicted, or attempted to evict tenants for violating rules such as prohibitions against receiving Black guests). The district court, therefore, improperly dismissed this claim.

## V.    CONCLUSION

Watts' complaint presented plausible claims for relief under Section 3604(b) and Section 3617 of the FHA and Section 1981 and Section 1982 of the Civil Rights Act.  We, therefore, reverse the district court's dismissal and remand the case for further proceedings.

**REVERSED and REMANDED.**

22-13763            JORDAN, J., Concurring            1

JORDAN, Circuit Judge, Concurring:

I join in Parts I, II, III, IV.B–D, and V of Judge Abudu's opinion for the court. As to Part IV.A, I concur in the judgment.

Ms. Watts alleges that Joggers Run, a residential community with a mandatory homeowners' association, violated various provisions of the Fair Housing Act, including 42 U.S.C. § 3604(b). Like the court, I believe the FHA claim under § 3604(b) has "substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

I reach that conclusion for the following reasons. First, § 3604(b) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, familial status, or national origin." Second, we have held that § 3604(b) reaches post-acquisition conduct. *See Ga. State Conf. of the NAACP v. City of La Grange*, 940 F.3d 627, 631–34 (11th Cir. 2019) (concluding that § 3604(b) applied to municipally-provided electricity, gas, and water services). Third, the conduct alleged by Ms. Watts—e.g., having her car towed from her property contrary to the association's rules, closing down the basketball court because of a belief that too many Black kids were at the court, and racial harassment that forced her to sell her home—is conduct that is covered by the "provision of services or facilities" language in § 3604(b). *See, e.g., Curto v. A Country Place Condo Ass'n*, 921 F.3d 405, 410–11 (3d Cir. 2019) (applying § 3604(b) to the rules of a communal pool in a condominium association); *Savanna Club Worship Serv., Inc. v. Savanna Club Homeowners' Ass'n*,

456 F. Supp. 2d 1223, 1230 (S.D. Fla. 2005) ("[P]art and parcel of the purchase of a home within a planned community are the rights and privileges associated with membership within the community. It would appear, therefore, that in the context of planned communities, where association members have rights to use designated common areas as an incident of their ownership, discriminatory conduct which deprives them of exercising those rights would be actionable under the FHA."). *Cf. Hunt v. Aimco Props. L.P.*, 814 F.3d 1213, 1224 (11th Cir. 2016) (applying § 3604(f)(2) of the FHA to the defendant, which allegedly prohibited the plaintiff's disabled son "from entering the community room, the pool area, and the office," because the alleged facts "sufficiently pled that [the defendant] placed conditions on [the son] that were not imposed on other residents and restricted his access to facilities in the complex that were open to other residents").

In Part IV.A, the court discusses 24 C.F.R. § 100.65(b)(4). But given the language of § 3604(b), the cases applying that provision to post-acquisition conduct, the mandatory nature of the homeowners' association, and the plausibility standard that governs, I do not see a need to discuss that regulation.